MYERS *v.* NEWCOMER.

[No. 13,878. Filed June 25, 1931. Rehearing denied December 15, 1931.]

*William Bosson, Clark & Kahl* and *Jackson & Hinchman,* for appellant.

*Charles E. Cox* and *Otis E. Gulley,* for appellees.

NEAL, C. J.—Appellees, plaintiffs below, instituted this action to recover judgment on a promissory note executed by appellant. The note was dated at Indianapolis May 21, 1923; it called for the payment of the principal sum of $1,500, with interest at seven per cent per annum, from date, and attorney's fees. The note fell due October 10, 1923, was payable to order of "myself," and was indorsed by the appellant.

The defendant, appellant, answered in five paragraphs: (1) General denial; (2) that the note had been obtained from her by fraud by one C. R. Griffin; that J. A. Barrett who delivered the note to plaintiffs knew that it had been obtained by false and fraudulent representations and that the negotiation of the note was in breach of an agreement; (3) no consideration; (4 and 5) proceeded on the same theory as No. 2, alleging in detail the alleged fraudulent acts Plaintiffs replied by general denial, and further that the note was purchased for a valuable consideration without knowledge that the note had been procured from plaintiff by fraud.

At the close of all the evidence, the court instructed the jury to return a verdict for the plaintiffs.

The only error assigned is the overruling of the motion for a new trial. The alleged error of law occurring at the trial presented by appellant arises in the giving of the peremptory instruction by the court.

A resume of the evidence follows: Appellant was a married woman, 35 years of age; had resided in the city of Indianapolis all her life and for many years lived at 829 Thompson Street in the northern part of the city; appellant's father and mother deceased when she was 15 years of age, and she thereafter lived with her grandmother until her marriage; appellant graduated from high school; her husband was engaged in the plumbing business; appellant inherited considerable property; she did her banking business at the National City Bank of Indianapolis, transacting her business with one Mr. James, who was the cashier of the bank; her acquaintance with Mr. James extended over a period of 10 years; appellant also knew Mr. McIntosh, president of the bank, and Mr. Welsh, who was a director in the institution.

One Clarence R. Griffin, whose business was that of oil salesman, had offices in the National City Bank Building in Indianapolis; appellant became acquainted with Mr. Griffin through Mr. James, who took her to Griffin's offices; Mr. Griffin was informed by Mr. James, in the presence of appellant, after the introduction, that the appellant was a good customer of the bank and he thought she (appellant) would be interested in the oil stock and that they had a lease on oil land in Kentucky; Mr. James informed appellant that she could rely "on all Mr. Griffin said, as Mr. Griffin was a prominent oil salesman; that he had made his brother, a doctor in Danville, Illinois, quite well to do by selling oil stock."

The office of Griffin was very luxuriously furnished and on the walls were pictures of oil wells, under con-

struction, and different pictures that pertained to oil drilling, and also the map of Kentucky; in a few days after the above-mentioned conversation, appellant again met Mr. Griffin; Griffin said to appellant in the conversation that the "Sterling Oil Stock or leases in Kentucky had a very promising future," and that, as soon as the stock was all sold, the stockholders would begin to realize on their money; appellant purchased two or three certificates of stock in the Sterling Oil Corporation, which certificates were delivered to her by C. R. Griffin; on May 21, 1923, appellant signed and delivered to Griffin the note in suit; at the time it was delivered to Griffin, Griffin promised appellant that he would not sell the notes; that the oil company's business would pay them out and "that she would have no expense"; that Griffin, in subsequent conversations, repeatedly informed appellant that he would not negotiate the notes; at some time during her negotiations with Griffin and James, they told her not to tell her husband about investing money and giving notes; "that some day it would turn out good, and I would be of fabulous wealth and that I could surprise my husband with it"; Griffin was to deliver to appellant an oil lease for the $1,500 note executed by appellant; about June 15, 1923, Griffin delivered to appellant an instrument of the following tenor: "Know all men by these presents that J. A. Barrett of Monticello, Kentucky, for and in consideration of the sum of one dollar and other valuable considerations, in hand paid by C. R. Griffin, the receipt of which is hereby acknowledged, has sold, assigned, transferred and set over and, by these presents, does sell and assign an undivided three-eighths interest in the following named leases and leasehold estates herein created: One lease dated August 16, 1921, given by Ninnie Roberts and heirs to J. A. Barrett, said lease containing 75 acres and being recorded in Book — Page — of the records of Wayne County, Kentucky. J.

A. Barrett further agrees, entirely at his expense, to complete, on the above described acreage, one well, said well to be drilled and cased in accordance with good oil-fields practise, and J. A. Barrett agrees also in the event commercial oil wells are secured, to furnish all customary and necessary materials to put said wells on the pump and to pay all labor costs connected therewith. The well to be drilled to the Chatauooga Shale, the work to be commenced within 365 days and prosecuted with due diligence until completion. J. A. Barrett further agrees to pay all operating expenses until such a date as the above-described well is completed. This assignment is intended to cover the above-described interest in all material and equipment to be used in pumping well." The instrument was signed by J. A. Barrett, of date of June 15, 1923; the purported assignment of an interest in an oil lease with the stipulations therein contained was acknowledged before a notary public in Hamilton County, Indiana, without date. After the notary certificate appears the following: "For value received I hereby assign all my right, title and interest in the within contract and lease to Geneva Bates Myers. C. R. Griffin." The last purported assignment bears no date and no acknowledgment.

Appellant never received anything of value by virtue of the purported assignment; she never received "any money of any kind or value of any kind on account of the lease"; she never received any knowledge of what became of the oil lease in Kentucky; appellant "would not have executed the note if she hadn't believed and relied upon the statement of Griffin and James in regard to the oil fields and in regard to the statement of Mr. Griffin that he wouldn't transfer the note."

It further appeared in evidence that Barrett, on or about July 17, 1923, was in the city of Indianapolis at

the place of business of appellees, who were engaged in the retail of Paige and Jewett automobiles at 1112 North Meridian Street as partners; that Barrett offered the note executed by appellant to Joseph W. Newcomer, one of the partners and one of the plaintiffs herein, and $339 for a new Paige car; that Joseph Newcomer called Mr. James of the National City Bank and wanted to know about Geneva Bates Myers; Newcomer was informed that "she is all right, her account has always been satisfactory"; thereafter, Joseph Newcomer accepted the note as part payment of the automobile without indorsement; it appears that at the time Mr. James informed Newcomer that Geneva Bates Myers was all right, she had a small balance in her account; that the bank was pressing her for payment on other notes discounted at the bank by Griffin, and executed by appellant for oil stock sold her by Griffin, which notes were past due.

Joseph Newcomer gave evidence to the effect that he was associated with his brother, Lloyd Newcomer, in the sale of automobiles in the city of Indianapolis; that "we sold Barrett a Paige car for $1,800"; that he took the note signed by Geneva Bates Myers as part payment; that afterwards he negotiated the note at the National City Bank; that he was forced to take up the note; that, when the note "was presented to me, I said 'I don't know this Geneva Bates Myers, I'll have to make some inquiry.' I called up James. I went down to the bank and told James that Mr. Barrett was up to buy an automobile and had this note he wanted to turn in on the automobile and I said, 'What do you know about it. What do you know about Geneva Bates Myers?' He said, 'She has been dealing here, she is all right. Her account has always been satisfactory.' " Joseph Newcomer gave evidence that he did not have any knowledge of any fault or any facts relating to the note other

than heretofore stated; that he did not know Barrett and did not talk to him about the note, and that he made no inquiry of Mrs. Myers about the note.

Section 55, Negotiable Instruments Law (Acts 1913 p. 120, §11414 Burns 1926) reads as follows: "The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith or under such circumstances as amount to a fraud." Section 59 of the same law (§11418 Burns 1926) reads: "Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title . . . in due course."

It is the law that "where a suit is brought on a bill or note by an assignee and facts are pleaded and proved showing that its execution was obtained by fraud or duress, or that it was executed for a certain purpose and placed in the hands of a party (in trust to use for that purpose) and he dishonestly negotiated it for a different purpose, in violation of the trust under which he held it, a subsequent holder cannot recover upon it without showing that he is a *bona fide* holder, and that he paid a valuable consideration for it." *Wheat* v. *Goss* (1923), 193 Ind. 558, 141 N. E. 311.

Whether or not there has been fraud in any given case is generally a question for the jury. The decisions of the reported cases abound with the expression that fraud is peculiarly a question for the jury, and that it should be submitted to them if there is evidence to support a finding of its existence. Under the facts of this case, as between the immediate parties,

that is, between Geneva Bates Myers and C. R. Griffin, we are of the opinion that sufficient facts were alleged and proved to have required the submission of the issue of fraud to the jury. *National City Bank* v. *Kirk* (1922), 85 Ind. App. 120, 134 N. E. 772; *Ohio Contract Purchase Co.* v. *Bolin* (1929), 90 Ind. App. 85, 168 N. E. 196; *Wittenmyer* v. *DeTraz* (1929), 91 Ind. App. 227, 168 N. E. 461.

Where, as here, fraud was alleged as a defense and facts proved to sustain the issue as between the immediate parties, the burden rested upon plaintiffs to prove that they, as partners, were *bona fide* holders for value, and that the partnership paid a valuable consideration for the note, in order to recover thereon.

If the plaintiffs have discharged that burden and there was no evidence from which a jury could have drawn a legitimate inference that the partners were not purchasers in good faith, the trial court was correct in his instruction to the jury to find for the plaintiff; otherwise, in error.

The plaintiffs alleged in their second paragraph of reply "that they are and were, on and before July 16, 1923, engaged in the business of selling automobiles at retail in the city of Indianapolis; that one J. A. Barrett, on said July 16, 1923, came to their place of business and negotiated for the purchase of a Paige automobile of the price of $1,830; that he offered in part payment of said automobile the note sued on in plaintiff's complaint at its face value of $1,500, and, in addition thereto, the sum of $330 in cash . . . that, at the time of the purchase of said note by plaintiffs as aforesaid, they had no knowledge nor notice that said note was procured by fraud or that said note was given without consideration as alleged in the second and third paragraphs of complaint."

Appellee Joseph Newcomer, one of the partners, testi-

fied he had no knowledge of the fraud. There is not a scintilla of evidence as to whether the other partner had or did not have knowledge of the defenses to the note. In Daniel, Negotiable Instruments (6th ed.) §815, we find the following statement: "In an action by a partnership bank on a note fraudulent in its inception, taken by it as collateral, the partnership must show that all its members were at the time of the purchase ignorant of the fraudulent character of the note." In *Frank & Darrow* v. *Blake* (1882), 58 Iowa 750, the note was made payable to the order of the maker, and indorsed by him in blank and given to one Parsons, who transferred it before maturity and for a valuable consideration, to the plaintiffs, who were partners. The note was procured by fraud. The purchase of the note was made by one Tenny, a member of the plaintiffs' firm, who testified that he had no knowledge of any of the circumstances connected with the note. The court said: "There remains then, only to be considered, whether proof that Tenny was, at the time of the purchase, without knowledge of the fraud, was sufficient. The defendant contends it was not. He contends that while Tenny's knowledge would be deemed the knowledge of the firm, his ignorance would not necessarily be deemed the ignorance of the firm. It must be admitted, of course, that the fact that Tenny was ignorant of the fraud, would not show that his partners were. . . . We know of no ground upon which it could be presumed that the purchasing partner's copartners were ignorant of the fraudulent character of the note because he was. He might have been the one selected and put forward to make the purchase because he was ignorant. We are aware that if the rule is as we hold, that where a partnership seeks to recover as a bona fide purchaser of a promissory note, fraudulently procured, the burden is upon the partnership to show that all the members were

ignorant of the fraud at the time of the purchase; it is necessary for the entire safety of a partnership in purchasing a note, that all the members should be consulted or inquired of by the purchasing partner. But this is imposing no great burden. We cannot suppose that promissory notes are often purchased by partnerships under such exigency upon their part that the necessity for the caution required by the rule laid down, would impose an unnecessary restriction upon the business." *Merchants Nat. Bank* v. *Grigsby* (1915), 170 Iowa 675, 149 N. W. 626; *City of Keokuk* v. *Ft. Wayne Electric Co.* (1894), 90 Iowa 67, 57 N. W. 689; *Arnd* v. *Aylesworth* (1909), 145 Iowa 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638. See *Commercial Savings Bank, etc.*, v. *Raber* (1929), 90 Ind. App. 335, 168 N. E. 697.

The principle of law as above stated by the Supreme Court of Iowa is applicable to the facts of this case. It was not sufficient, in order for the plaintiffs to recover, to prove that one of the partners was ignorant of the fraud. The burden was upon the plaintiffs to show that they were holders in due course.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.